UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | CHAPTER 11 |
| | CASE NO.: 6:15-BK-07275-KSJ |
| PROGRESSIVE PLUMBING, INC., | |
| | |
| PROGRESSIVE SERVICES, LLC and | JOINTLY ADMINISTERED WITH |
| GRACIOUS LIVING DESIGN | CASE NO.: 6:15-BK-07276-KSJ |
| CENTER, INC. | CASE NO.: 6:15-BK-07277-KSJ |
| | |
|        Debtors. | |
| _____/ | |
| | |
| KELLOGG & KIMSEY, INC. | |
| A Florida Corporation, | |
| | |
|     Plaintiff | |
| | |
| v. | Adv. Case No.:  6:17-AP-00044-KSJ |
| | |
| PROGRESSIVE PLUMBING, INC., | |
| A Florida Corporation, ALLIED WORLD | |
| SPECIALTY INSURANCE COMPANY, | |
| a Foreign Profit Corporation, | |
| | |
|     Defendants. | |
| _____/ | |
| PROGRESSIVE PLUMBING, INC., | |
| | |
|     Counter-Plaintiff, | |
| | |
| v. | |
| | |
| KELLOGG & KIMSEY, INC., | |
| | |
|     Counter-Defendant. | |
| _____/ | |
| PROGRESSIVE PLUMBING, INC., | |
|     Cross-Plaintiff, | |
| | |
| v. | |
| | |
| ALLIED WORLD SPECIALTY | |
| INSURANCE COMPANY, | |

  Cross-Defendant.
_____/
ALLIED WORLD SPECIALTY
INSURANCE COMPANY,

  Cross-Plaintiff,

v.

PROGRESSIVE PLUMBING, INC.,

  Cross-Defendant.
_____/

## PLAINTIFF, KELLOGG & KIMSEY, INC.'S, OPPOSITION TO DEFENDANT, ALLIED WORLD SPECIALTY INSURANCE COMPANY'S, MOTION FOR PARTIAL SUMMARY JUDGMENT

  Plaintiff/Counter-Defendant, KELLOGG & KIMSEY, INC. ("K&K"), pursuant to Fed. R. Civ. P. 56, hereby responds in opposition to the Amended Motion for Partial Summary Judgment (the "Motion") [Doc. 69, 75, 77], submitted by Defendant/Counter-Plaintiff/Cross-Plaintiff/Cross-Defendant, ALLIED WORLD SPECIALTY INSURANCE COMPANY ("Allied"), and therefore states as follows:

## SUMMARY OF ARGUMENT

  This Court should reject Allied's unsupported interpretation of the Subcontract[1] and Bond[2] and deny Allied's Motion. A plain reading of the Bond, as well as the Subcontract as incorporated therein by reference, clearly negates Allied's "election of measure of damages" theory and

---

[1] The term "Subcontract" means and refers to the Subcontractor Agreement entered into on February 22, 2013 between Progressive and K&K for plumbing installation at 1800 West End Hotel & MX Development, 1800 West End Ave., Nashville, Tennessee, a true and correct copy of which is attached to the Adversary Complaint as Exhibit "C" [Doc. 1.3].

[2] The term "Bond" means and refers to Performance Bond No. D0000000007, issued by Allied, as surety, on behalf of Progressive, as principal, and for K&K, as Obligee, in the penal sum amount of One Million Seven Hundred Fifty Thousand and 00/100 Dollars ($1,750,000). A true and correct copy of the Bond is attached to the Adversary Complaint as Exhibit "B." [Doc. 1.2].

undermines Allied's vaguely-worded Affirmative Defense No. 21.

Upon default under the Subcontract and the Bond, Allied was contractually required to "promptly reimburse" K&K for **any and all losses, costs, and expenses** reasonably incurred in the course of (i) supplementing Progressive's performance, (ii) completing Progressive's performance, or (iii) allowing Progressive to continue its work. *See* Doc. 1.2, p. 1. (emphasis added). Allied's arguments to the contrary ignore the plain language of the Bond itself, as well as the language of the Subcontract incorporated by reference into the Bond, which language clearly specifies that these elements are not mutually exclusive or limiting in any fashion. Thus, the notion of any 'election of remedies' requirement is contrary to the plain language of the Bond, would produce an absurd result, and is a concept that exists only within the corners of Allied's Motion.

Allied also exceeds the permissible scope of its "partial" motion for summary judgment by effectively asking the Court to resolve multiple, disputed issues of fact without any evidentiary showing whatsoever. Specifically, although cast as a pure question of law and related contract interpretation, Allied's Motion effectively asks the Court to ignore the fact that (1) no election of remedy provision exists under either the Subcontract or the Bond; (2) that Allied has not established that any election was ever made; (2) that K&K's purported election to supplement followed two previous notices of default and months during which Progressive was in default (and accruing damages) and when no supplementation had yet been undertaken; (3) that Allied has failed to establish when any remedy was purportedly elected; (4) and that Allied has not alleged or supplied facts to establish how any damage claimed by K&K should or even could be categorized under its rubric. Accordingly, the relief requested by Allied in its Motion is akin to a prospective declaratory judgment on disputed factual issues prior to trial and is therefore inappropriate on these grounds as well. *See*, "Wherefore" clause, Doc. 77, p. 11.

I.  **BACKGROUND**

This adversary proceeding arises from a dispute between K&K and Progressive under the terms of a Subcontract executed on February 22, 2013, relating to the construction of a hotel project identified as 1800 West End Hotel and MX Development in Nashville, Tennessee (the "Project"). *See* Adversary Complaint, at Exhibit "C" [Doc. 1.3], wherein Progressive contractually agreed to perform plumbing work for the Project and for K&K as General Contractor. *See id.* In connection with applicable Project and Subcontract requirements, Progressive applied for and Allied issued a Subcontract Performance Bond and Labor and Material Payment Bond. *See id.*, at Exhibit "B" [Doc. 1.2].

Progressive's work on the Project began around March 2013. *See id.*, at Exhibit "C" [Doc. 1.3]. At this time, Progressive hired its initial crew from a pool of local plumbers and helpers, many of whom lacked experience with large plumbing jobs. *See* Deposition of John Mazzeo ("Mazzeo Depo"), 35:3-11, 35:24-36:11, 58:17-25, and 59:1-15; Deposition of Bo Burns ("Burns Depo"), 17:17-25.

The construction market in Nashville, TN was thriving at that time, leaving very few skilled (or even semi-skilled) laborers for an out-of-state subcontractor looking to hire for a one-off project *See* Deposition of David Reed of July 3, 2018 ("Reed Depo D2") Vol I, 76:20-77:8 and Deposition of Essie Hamill ("Hamill Depo"), 8:22-9:6. This resulted in Progressive filling out its labor force with mostly unskilled day labor provided through several companies (Tradesman International, Labor Finders, and others) and to hire another local plumbing subcontractor to take over a substantial portion of its scope of work under the Subcontract. *See* Deposition Exhibit 253 [Doc. 93.1]; Deposition of William Lawson of June 11, 2018 ("Lawson Depo D1") 43:6-16 and 110:9-12. Though this labor was largely ineffective and required greater supervision by Progressive, the additional costs of paying retail prices for third-party labor exacerbated financial issues

Progressive was already facing. *See*, Deposition of William Lawson dated June 12, 2018 ("Lawson Depo D2"), 91:2-19 and 91:23-92:15; Deposition Exhibit 255 [Doc. 93.2]. Compounding and arising in connection with this issue, Progressive was attempting to suppress orders for supplies and equipment so as to postpone larger purchases. *See, e.g.,* Burns Depo 26:12 – 29:4. This turned out to be a serious error, as unforeseen material lead times ended up causing Progressive substantial delays. *See, e.g., id;* Mazzeo Depo*, generally.*

By May 2014, Progressive had fallen well behind schedule and was in serious default of the Subcontract, and on May 27, 2014, K&K responded to these shortfalls by issuing a 72-Hour Notice of Intent to Terminate (the "May Notice") to Progressive, outlining its multiple deficiencies at the Project. *See* Doc. 74.1 at 25:12-26:12 and 19:2-20:3; Ex. 207 [Doc. 73-1]. On top of this, Progressive's completed work proved deficient, necessitating repairs and causing further delays. *See, e.g.,* Doc. 74.1, 25:12-26:12; Mazzeo Depo 28:6-17 and 73:2-6. On May 29, 2014, Progressive issued return correspondence that acknowledged these deficiencies (admitting they were providing comments related to "defaults or breaches") and outlined a remediation plan. [Doc. 93.3]. Faced with the choice of allowing Progressive to attempt to cure its defaults or undergoing the expense and challenges of replacing a major trade mid-Project, K&K permitted Progressive to continue on the Project. Doc 74.1, 53:25 – 54:13.

Unfortunately, the state of Progressive's work and workforce grew worse as time drew on, and on August 28, 2014, K&K issued an additional default notice citing further issues with Progressive's materials, manpower, and work quality and advising that K&K was seeking to supplement Progressive's forces. *See* Doc. 74.1 at 33:18-34:13; August 28 Email (the "August Notice") [Doc. 93.4]. Those defaults remained uncured, and on November 26, 2014, K&K sent another default notice advising Progressive's mounting failures and K&K's intention to continue to supplement Progressive's dwindling and under-skilled work force. *See* Doc 74.1 at 61:7-62:14;

November Default Letter (the "November Notice") [Doc. 93.5]. Thereafter, K&K provided additional forces while Progressive withdrew its own in order to save money. *See* Deposition of David Reed dated June 29, 2018 ("Reed Depo D1") Vol. II, 190:18 – 191:20; Lawson Depo D1, 125:20-126:23.

On April 7, 2017, K&K filed the instant Adversary Proceeding [Doc. 1] against Progressive and Allied seeking damages resulting from Progressive's consistent delays and faulty workmanship on the Project.[3] However, Allied now moves for partial summary judgment on Affirmative Defense No. 21, in which Allied suggests: "[s]ome or all of Plaintiff's claimed damages are not covered by the terms of the performance bond." *Id*. Allied insists that Affirmative Defense No. 21 is summary judgment-worthy based on its theory that the Bond limits K&K to one of three expressed measures of damages. *See* Adversary Complaint, at Exhibit "B."

However, no logical reading of the plain language of the Subcontract and Bond supports Allied's Motion. Moreover, because Allied's entire argument is predicated on the vague defense asserting that "some or all" of K&K's damages are not recoverable, the defense raised does not correspond procedurally to the relief sought, which seems to be in the nature of a declaratory judgment. Further, because the issues raised in Affirmative Defense No. 21 are intertwined with multiple, disputed issues of material fact, Allied's Motion must be denied.

## II.   OPPOSITION TO ALLIED STATEMENT OF FACTS

Allied sets forth numerous allegations in its Statement of Undisputed Material Facts in Support of its Partial Motion for Summary Judgment ("SUMF") which are purported to be undisputed, but which are both disputed and material to the instant Motion. [Doc. 70].

---

[3] In May 2015, K&K sued Progressive and Allied in the Circuit Court for Sarasota County, Florida, Case No. 2015-CA-002631NC, but voluntarily dismissed its suit when Progressive filed for Chapter 11 bankruptcy.

Accordingly, K&K expressly disputes such purported facts, including specifically those contained in paragraphs 6, 17, 18, 27, 28, 31, 33, and 34 of the SUMF. Further, where Allied claims it is providing the "relevant" part of specific contract provisions, K&K reserves its right to provide other relevant portions of those same contracts. *See*, *e.g.*, SUMF at ¶¶ 5, 8, 15.

### A. The Subcontract Does Not Provide a Mutually Exclusive "Choice of Remedies"

Allied's allegation 6 is not a fact at all, but rather posits the legal theory that Paragraph 18 of the Subcontract provides a "choice of remedies" for the Contractor in the event of a Default by the Subcontractor. [Doc. 70, at ¶ 6]. However, Paragraph 18 does not provide a "choice of remedies." Rather, Paragraph 18 of the Subcontract sets forth a non-exclusive list of ways in which K&K may be damaged as a result of Progressive's defaults, for which Allied is obligated to pay "any and all losses, costs, and expenses" which may be "reasonably incurred." [Doc. 1.2].

Notably, the quoted portions of Paragraph 18 plainly state: "if, in the opinion of the Contractor, should Subcontractor take or fail to take any action which would cause or threaten to cause delay in the general progress of the work under the Prime Contract, or in any way adversely affect the quality of the work under the Prime Contract, ***Contractor shall have the right but not the obligation to any or the appropriate combination of any of the following remedies or courses of action***." *Id*. (emphasis added). Thus, while Paragraph 18 in the Subcontract provides a list of possible remedies for defaults in the progress of the work, the remedies are in no way capable of being construed as mutually exclusive. Contrary to Allied's assertions, Allied and Progressive agreed under the Subcontract that K&K has the right to utilize "any or the appropriate combination of" remedies or courses of action. *Id*. Specific remedies are detailed more extensively in paragraph 18's subcategories (A) through (E).

Nothing in the language of Paragraph 18 provides any limit on recovery of reasonably incurred damages. For example, subparagraph 18(A) allows K&K to investigate Progressive's default and "expedite a cure or remedy *in any way or manner whatsoever*, *including, but without limitation, supplementation*…" (emphasis added). Such expansive language precludes even the barest suggestion of mutual exclusivity of such remedies. Instead, K&K has the right to "expedite a cure or remedy in any way or manner whatsoever." *Id*. In fact, 18(E) contains an inclusive provision expressly allowing for "all other remedies, either statutory or otherwise, that Contractor may have at law or equity." *Id*.

Paragraph 18 of the Subcontract further sets forth the surety's obligations and consequences under alternative *combinations* of remedy selections, and even provides examples of the consequences of certain remedy combinations. Among these examples:

> Should Contractor elect option A*, and/or* B or C, Subcontractor and its surety hereby knowingly and voluntarily waives any right they may have in any performance bond to remedy any default or complete any of subcontractor's work.

*Id*. (emphasis added). A plain reading of this portion of Paragraph 18 leads to only one logical conclusion: K&K was accorded the right to choose any one or more remedial courses of action to remedy Progressive's multiple defaults. *Id.*

### B. K&K Put Progressive On Notice Of Default On At Least Three Occasions Beginning In May 2014

Likewise, K&K disputes alleged facts 17 and 18 because they are incomplete characterizations. *See* SUMF at ¶¶ 17, 18. On May 27, 2014, K&K sent Progressive the May Notice. *See* Reed Depo at 19:2-20:3 [Doc. 74.1]; *see also* Ex. 207 [Doc. 73-1]. This correspondence was indisputably a notice of default.[4] *Id.* Further, the May Notice featured a

---

[4] Indeed, William Lawson, Progressive's President, admits in his return correspondence that his proposed plan of action is designed to remedy the "defaults or breaches" outlined in the May

specific reservation by K&K of "all other remedies, either statutory or otherwise, that it may have at law or equity." *Id*. Thus, although K&K did not actually terminate Progressive's contract, it never withdrew the declaration of default contained in the May Notice. *Id.* K&K later sent another notice of default in August 2014. Doc. 74.1 at 33:18-34:13; August Notice [Doc. 93.4]. Again, that declaration of default was never withdrawn. *Id.* Another notice of default was issued in November 2014; the November Notice. Doc. 93.5; Doc 74.1 at 61:7-62:14.  Similarly, Allied's alleged facts 18 and 19 assert that K&K's letter was sent pursuant to paragraph 18-D and that the letter placed Progressive on notice pursuant to Paragraph 18-D. SUMF at ¶¶ 18-19.  However, as noted above, the letter reserved all K&K's remedies, statutory or otherwise.

K&K disputes Allied's purported facts 27 and 28. *See* SUMF at ¶¶ 27-28.  While David Reed, K&K's Senior Project Manager, declared Progressive to be in default under the terms of Paragraph 18 (A) on November 26, 2014, the characterization of Mr. Reed's letter as a "formal" Notice of Default suggests a distinction without meaning.  Further that correspondence was not the first declaration of default sent to Progressive, which is one possible reading of Allied's allegation. *See* Doc. 74.1 at 100:11-17. In fact, both the May Notice and the August Notice were previously provided to Progressive as declarations of default. *Id*. at 99:21-25.

Allied's allegation 31 states that "[p]er K&K, The Declaration of Default encapsulated the major reasons K&K was defaulting Progressive." This characterization is incomplete, as Mr. Reed also testified that he "guarantee[d] there were more than what was enumerated" in that correspondence.  Doc. 74.1 at 62:22-63:3.

Purported fact 34 alleges that K&K supplemented Progressive until the end of the Project, in January 2015. SUMF at ¶ 34.  Mr. Reed did testify that from Christmas 2014 until the first week

---

Notice. [Doc. 93.3].

of January 2015, there were no Progressive employees on the job, leaving only supplemental labor. Doc. 74.1 at 97:5-12. However, Progressive later was involved with plumbing completion tasks, repair, and remediation into March of 2015 at which time no supplemental labor remained. Doc. 74.1 at 98:13-17.

### III.    ARGUMENT

This Court is well-acquainted with and requires no belaboring of the legal standard for considering summary judgment motions, as outlined in *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted). In the instant case, Allied moves for partial summary judgment on Affirmative Defense No. 21, claiming that "some or all of K&K's damages in Counts I and II of the Adversary Complaint are not covered by terms of the performance bond." *See* Motion at 3. However, Allied neither identifies which of K&K's damages are or are not covered by the Bond nor how it proposes the Court should determine and limit same. *See generally* Allied's Motion. Allied's arguments are unavailing.

#### A.    The Plain Language Of The Bond And Incorporated Subcontract Enables K&K To Recover All Of Its Damages Resulting From Progressive's Defaults

K&K is entitled to all of its reasonably incurred damages under the plain language of the Bond and Subcontract. Under Florida law, both the Bond and Subcontract are subject to general principles of contract interpretation[5]. *See, e.g.*, *American Home Assurance Co. v. Larkin Gen. Hosp., Ltd.*, 593 So. 2d 195, 197 (Fla. 1992) ("A bond is a contract, and, therefore, a bond is subject to the general law of contracts."). This means the Court should (1) give meaning and effect to each term of the Bond and incorporated Subcontract; (2) assume that each clause in both documents has a purpose; and (3) accept that the parties intended for each and every provision to be implemented

---

[5] With exception to rules of construing ambiguities in bonds against the drafter with respect to bonds, as explained in Section III (A), *infra*.

in harmony and as written. *See*, *Stinson, Lyons, Gerlin & Bustamante, P.A. v. Brickell Bldg. 1 Holding Co.*, 747 F. Supp. 1470, 1472-1473 (S.D. Fla. 1990) (citing *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938 (Fla. 1979).

Under these principles, the Bond and the incorporated Subcontract must be read as though the two were, in fact, one document. *See, e.g.*, *Collins v. Nat'l Fire Ins. Co.*, 105 So. 2d 190, 194 (Fla. 2d DCA 1958) ("Where a written contract refers to and sufficiently describes another document, that other document or so much of it as is referred to, may be regarded as a part of the contract and therefore is properly considered in its interpretation."). As a performance bond typically—indeed, necessarily—is based upon and incorporates the terms of a subcontract, courts must look to the subcontract in interpreting the bond. *See Nat'l Fire Ins. Co. v. Fortune Constr. Co.*, 320 F.3d 1260, 1275 (11th Cir. 2003) (where the bond at issue expressly incorporates the subcontract, the Court must look to the subcontract to determine "the purpose of the bond.") (citations omitted); *see also City of Orlando v. H.L. Coble Co.*, 282 So.2d 25, 27 (Fla. 4th DCA 1973); *American Home Assurance Co. v. Larkin General Hospital, Ltd.*, 593 So. 2d 195, 198 (Fla. 1992) ("[T]he purpose of a performance bond is to guarantee the completion of the contract upon default by the contractor.").

Here, the Subcontract, as incorporated by the Bond, expressly provides:

> [I]f, in the opinion of the Contractor, should Subcontractor take or fail to take any action which would cause or threaten to cause delay in the general progress of the work under the Prime Contract, or in any way adversely affect the quality of the work under the Prime Contract, ***Contractor shall have the right but not the obligation to any or the appropriate combination of any of the following remedies or courses of action*** . . .

*See* Adversary Complaint, at Exhibit "C," ¶ 18 [Doc. 1.3]. This language is followed by a plainly non-exclusive list of potential remedies, many of which reference one another as well as various combinations thereof. *See, e.g.*, *id.* at ¶ 18(E) ("All other remedies, either statutory otherwise, that

Contractor may have at law or equity."). Notably, the Bond expressly incorporates the above-language and Subcontract, "which contract is by reference made a part hereof[.]" *See id.* at Exhibit "B." The Bond even echoes the Subcontract's intent to compensate K&K for all damages in the event of a default: "[w]henever Subcontractor shall be, and be declared by General Contractor to be in default under the Subcontract . . . the Surety shall: 1) Promptly reimburse General Contractor for ***all losses, costs and expenses, including reasonable attorney's fees, incurred by General Contractor***[.]" *Id.* Further, no language included in the Bond in any way even hints at the barest suggestion of limitation—the words "only," "limited," "exclusive," or similar words conveying boundaries on the remedies provided under the parties' agreements cannot be found. *Id.*

The above-cited language, present in both the Bond and Subcontract, providing for *in*clusivity of remedies reveals a plain contractual intent that K&K be compensated for all of its damages in the event of Progressive's default. No other construction or meaning of the above-cited language is possible within the confines of Florida's canons of contract interpretation. As both documents allow for a wide array of non-exclusive remedies to account for K&K's damages, it would require a tortured reading contrary to the parties' obvious intent to find otherwise.

Under the express terms of the Subcontract, Allied had clear notice (and by signing the Bond, expressly agreed) that, upon Progressive's default, K&K was able to avail itself of any combination of remedies including supplementation, remediation, and repair. Allied also agreed that K&K had the right to "investigate any such default and expedite the cure or remedy for same ***in any way or manner whatsoever***, ***including, but without limitation, the supplementation*** of Subcontractor's forces or providing equipment or materials at Subcontractor's expense." *Id.* at ¶ 18. Any interpretation to the contrary runs afoul of the plain intent of both the Subcontract and Bond. Accordingly, the Court should deny Allied's Motion on this basis alone.

**B.**     **The Bond And Subcontract Are Not Ambiguous and No Conflict Exists Between Them, Nor Could Any Ambiguities Therein Be Construed Against Any Party Other than The Surety, Allied**

By its Motion, Allied repeatedly and confusingly skirts the issue of ambiguity in the language of the Subcontract and Bond. On the one hand, Allied repeatedly suggests that the language of the Bond is "clear and unambiguous and its construction therefore presents an issue of law for the court." *See, e.g.*, Motion at pp. 10. However, Allied also proceeds to suggest in a series of footnotes that "any such ambiguity is construed against the drafter" and "as this Court has recognized . . . to the extent the Subcontract conflicts with the operative language in the Bond, the language in the Bond prevails." *See id.* at pp. 10 fn. 2, 11 fn. 3 (citing *In re Mona Lisa at Celebration, LLC*, 472 B.R. 582, 645 (2012)). Moreover, Allied's argument that the Bond language is controlling necessarily asserts a conflict in terms, which must be based on ambiguity between the Bond and the incorporated provisions of the Subcontract. Yet, Allied cannot continue to sit on both sides of the fence with respect to the issue of ambiguity; nor can Allied conflate issues of law with disputed issues of fact for purposes of its Motion.

At the outset, Allied should not be permitted to read a conflict into the language of the Bond solely because the Bond and the Subcontract utilize different language to convey the same meaning. *See*, *Coca-Cola Enters. v. Novelis Corp.*, 297 F. App'x 890, 892 (11th Cir. 2008) (A party "cannot create ambiguity in a contract simply by alleging a different interpretation of a contractual provision."). Instead, under the above-cited principles of law, both the Bond and Subcontract must be read together. S*ee e.g.*, *Great Am. Ins. Co. v. Sch. Bd. of Broward Cty.*, No. 09-61636-CIV-ZLOCH/ROSENBAUM, 2010 U.S. Dist. LEXIS 120030, at \*41-43 (S.D. Fla. July 30, 2010) ("Consistent with Florida law, therefore, the Court reads the Bond and Contract together"); *see also CC-Aventura, Inc. v. Weitz Co., Ltd. Liab. Co.*, No. 06-21598-CIV-HUCK/O'SULLIVAN, 2008 U.S. Dist. LEXIS 53439, at \*28 (S.D. Fla. July 14, 2008). Further,

in its arguments, which are based on the presumption of ambiguity, Allied raises a disputed issue of material fact not capable of determination on a motion for summary judgment. *See, e.g.*, *Hibiscus Assocs. v. Bd. of Trs. of the Policemen & Firemen Ret. Sys.,* 50 F.3d 908, 919 (11th Cir. 1995) ("Generally, the proper construction of an ambiguous contract term is a question of fact which should be reserved to the [trier of fact].").

Crucially, in its attempts to imply ambiguity in the form of conflict between the Bond and Subcontract, Allied cites *Daake* for the proposition that ambiguities in a bond are construed against the drafter thereof, implying that K&K drafted the Bond. *See* Motion, at pp. 10 fn. 2. However, the *Daake* case does not pertain to bonds, sureties, or related insurance policies; instead, *Daake* concerns a contract for construction of a seawall. *See Daake v. Decks N Such Marine, Inc.*, 201 So. 3d 179, 180 (Fla. 1st DCA 2016). Importantly, the principles expressed in *Daake* do not apply in the suretyship context, where the language of a Bond is universally construed against the surety irrespective of negotiations in drafting. *See, e.g.*, *Gulf Power Co. v. Ins. Co. of N. Am.*, 445 So. 2d 1141, 1142 (Fla. 1st DCA 1984) ("In this regard we must observe that contracts of surety are regarded as analogous to contracts of insurance, **and are to be strictly construed against the surety and in favor of the obligee**.") (emphasis added); *Nat'l Fire Ins. Co. v. L.J. Clark Constr. Co.*, 579 So. 2d 743, 745 (Fla. 4th DCA 1991) ("Generally, any ambiguity as to the nature of a bond should be construed against the surety and in favor of granting the broadest possible coverage to those intended to be benefited by protection of the bond."); *Sch. Bd. v. Great Am. Ins. Co.*, 807 So. 2d 750, 752 (Fla. 4th DCA 2002) ("Florida's policy is to construe any ambiguity in a bond 'in favor of granting the broadest possible coverage to those intended to be benefitted by protection of the bond.'") (citations omitted).

Additionally, Allied cites one of this Court's prior opinions, *In re Mona Lisa at Celebration, LLC*, 472 B.R. 582, 645 (2012), for the proposition that the language of a Bond

prevails over conflicting language and/or ambiguities contained in the Subcontract. However, in *Mona Lisa*, this Court held that "operative clauses of a contract prevail over recital clauses and 'whereas' clauses when a conflict arises between the two." *See id.* Of course, the instant case does not involve a conflicting recital clause, nor a conflict between two competing provisions in a contract (or any conflict at all, for that matter). Accordingly, the *Mona Lisa* case is not applicable to the one at hand, save for this Court's observation that a Bond should be construed in line with its underlying purpose. *See id* ("This interpretation is supported by the underlying purpose of the surety bond in § 718.202, which is to protect the first 10% of plaintiffs' deposits from misuse.").

The Court should disregard Allied's veiled suggestions of ambiguity in the Subcontract and Bond and construe the provisions of each in harmony and according to their unambiguous terms. However, to the extent the Allied wishes to find ambiguity in the documents, the Bond should be strictly construed against the Allied, and in favor of K&K as obligee in light of the Bond's fundamental purpose (i.e., guaranteeing performance of Subcontract obligations). Allied's arguments to the contrary misapply Florida law and should be disregarded.

### C. Allied's Interpretation Of The Bond And Subcontract Ignores The Plain Language Of Both And Produces A Patently Absurd Result

Allied's suggestion that the Bond and Subcontract divide K&K's compensable damages into mutually-exclusive pairings results in a patent absurdity which the Court should disallow. Florida's cannons of contract interpretation assume that contractual language constitutes the best evidence of the contracting parties' intent. *See, e.g.*, *Murry v. Zynyx Mktg. Communications, Inc.*, 774 So. 2d 714 (Fla. 3d DCA 2000) ("It is axiomatic that the clear and unambiguous words of a contract are the best evidence of the intent of the parties."). Further, a Court must interpret a contract in such a manner as to avoid absurd results that stretch the language and original intent of the parties beyond reason and logic. *Gulliver Sch., Inc. v. Snay*, 137 So. 3d 1045, 1047 (Fla. 3d

DCA 2014) ("[U]nambiguous language is to be given a realistic interpretation based on the plain, everyday meaning conveyed by the words."); *see also S & S Packing, Inc. v. Spring Lake Ratite Ranch, Inc.*, 702 F. App'x 874, 878-79 (11th Cir. 2017) ("Under Florida law, a court 'must construe a contract in a manner that accords with reason and probability and avoid an absurd construction.'") (citations omitted).

In a related vein, a court may not adopt an interpretation of a contract that ignores or "reads out" entire provisions, treating the words and original intent of the contracting parties as "mere surplusage." *Equity Lifestyle Props., Inc v. Fla. Mowing & Landscape Serv.*, 556 F.3d 1232, 1242 (11th Cir. 2009) (Courts must read contracts to give meaning to all of its provisions and "avoid treating a word as redundant or mere surplusage 'if any meaning, reasonable and consistent with other parts, can be given to it.'") (citations omitted); *Amtrak v. Rountree Transp. & Rigging*, 422 F.3d 1275, 1284 (11th Cir. 2005) ("'[E]very provision in a contract should be given meaning and effect' to avoid rendering any provision 'mere surplusage.'") (citations omitted).

Here, Allied's theory that the contract language at issue implies an exclusive "choice of remedies" is incompatible with the language of the Subcontract. In effect, Allied asks this Court to read the words "appropriate combination of any of the following remedies or courses of action," and "and all other remedies that are available" out of the Subcontract—and thus the Bond— entirely. *See* Adversary Complaint, at Exhibits "B" and "C" [Docs. 1.2 and 1.3]. Accordingly, Allied's Motion improperly treats these terms as mere surplusage and ignores the intent of the contracting parties. *See, e.g.*, *Equity Lifestyle Props.*, 556 F.3d at 1242. The Court cannot and should not construe the Subcontract and Bond in this fashion, as the terms Allied hopes to read out are the best evidence of the specific intent of the parties to broadly provide multiple, non-exclusive remedies to K&K in the event of a default. *See, e.g.*, *Murry*, 774 So. 2d at 714.

When considered fully, Allied's proposed interpretation of the Subcontract and Bond also

leads to a patent absurdity and thus should be rejected in its entirety. Allied's interpretation of the Bond should be abandoned as unreasonable and absurd because it runs afoul of the basic purpose of a performance bond; that is, under no circumstances would K&K (or any general contractor) risk being unable to claim damages resulting from other defects in performance simply because it also must supplement or complete the work under the Subcontract, nor forgo supplementation and instead experience extended delays if it hopes to recover damages reasonably incurred from workmanship defaults on the Project. *Id.*

Moreover, Allied's interpretation of the Bond could leads to circumstances that could not possibly have been the intent of the parties. For instance, Allied's theory of exclusive remedies could result in forcing a contractor to choose between either (i) supplementing subcontractor causing serious project delays and being unable to recover any other damages incurred if the subcontractor then abandons the project (completion damages) or damages resulting from poor or deficient work—no matter how extreme the failure; or (ii) collecting damages caused by poor or deficient work but being precluded from then either supplementing or completing the subcontractor's work—regardless of whether the subcontractor either withdraws forces or abandons entirely. In all instances, this would lead to contractors immediately terminating the defaulting subcontractor in order to avoid potentially losing the ability to claim entirely valid and reimbursable damages. Moreover, under this bizarre interpretation of the Subcontract and Bond, upon reimbursement to the general contractor for the first dollar of damage caused by the subcontractor's poor work, the defaulted subcontractor would be then entitled to immediately abandon the project and collect the entire remaining balance of its contract sum, since the general contractor would be precluded by its "election" of damages remedy from charging the subcontractor for any damages related to either supplementation or completion of that work.

This Court should not entertain such an interpretation of the Bond or, by extension, the

Subcontract, given the absurd results would produce. As Allied's theory of the case simply ignores or treats as mere surplusage the language it doesn't find helpful to its claims, this Court should deny Allied's Motion and permit the case to proceed to trial as to all of K&K's damages.

## V.     CONCLUSION

Until trial, at which K&K will prove its damages, there is no way to meaningfully separate Affirmative Defense No. 21 from the rest of Allied's defenses. Seeking a bar of "some or all" damages is simply not a defense on which the Court can grant summary judgment; in fact, such language would not properly considered an affirmative defense at all. The damages in this case are intertwined with the issues of default and breach and cannot be separated into artificial categories that do not exist under the parties' agreements.  Accordingly, summary judgment on Allied's vague Affirmative Defense No. 21 should be denied.

When Progressive defaulted and breached the Subcontract, pursuant to the terms of the Subcontract, K&K had the right to exercise "any or the appropriate combination of any of" a number of remedies—all of which deal with potentially different situations and types of default. A plain reading of the language in the Subcontract and Performance Bond makes clear that Allied's reading of the Bond is simply wrong.  Accordingly, the Court should reject Allied's misinterpretation of the Subcontract and Bond and deny Allied's Motion for Partial Summary Judgment.

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that on August 18, 2018, I electronically served a true and correct copy of the foregoing via electronic mail to the following:  Jonathan P. Cohen on behalf of Allied World Specialty Insurance Company at jcohen@jcohenpa.com service@jcohenpa.com jstone@manierherod.com and jgillum@manierherod.com; Christine I. Parrish on behalf of Progressive Plumbing, Inc. at christy@cparrishlaw.com; and Michael A. Nardella on behalf of Defendant Progressive Plumbing, Inc. at mnardella@nardellalaw.com afebres@nardellalaw.com and msayne@nardellalaw.com.

                                **GURLEY & ASSOCIATES**
By: */s/ Joseph M. Herbert*
David E. Gurley, FBN 0402214
dgurley@GurleyAssociates.com
Secondary: eservice@GurleyAssociates.com
Joseph M. Herbert FBN 084260
jherbert@GurleyAssociates.com
Secondary: eservice@GurleyAssociates.com
601 S. Osprey Avenue
Sarasota, FL 34236
Telephone: (941) 365-4501
Facsimile: (941) 365-2916
*Attorneys for Kellogg and Kimsey, Inc.*

And

WILLIAMS PARKER HARRISON
DIETZ & GETZEN
/s/ M. Lewis Hall, III
M. Lewis Hall, III, Esq.
Florida Bar No. 0249513
200 South Orange Avenue
Sarasota, FL 34236
Email: lhall@williamsparker.com
Secondary Email:
mwengerd@williamsparker.com
Telephone: (941)366-4800
Fax: (941)954-3172
*Attorneys for Creditor, Kellogg & Kimsey, Inc.*