ORDERED.

**Dated:  September 30, 2019**

Karen S. Jennemann
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re | ) |
| | ) |
| PROGRESSIVE PLUMBING, INC., | ) Case No.  6:15-bk-07275-KSJ |
| PROGRESSIVE SERVICES, LLC and | ) Chapter 11 |
| GRACIOUS LIVING DESIGN | ) |
| CENTER, INC. | ) |
| | ) |
| | ) JOINTLY ADMINISTERED |
| Debtors. | ) Case No.: 6:15-BK-07276-KSJ |
| | ) Case No.: 6:15-BK-07277-KSJ |
| | ) |
| | ) |
| KELLOGG & KIMSEY, INC., | ) |
| A Florida Corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Adversary No. 6:17-ap-00044-KSJ |
| | ) |
| PROGRESSIVE PLUMBING, INC., | ) |
| A Florida Corporation, ALLIED WORLD | ) |
| SPECIALTY INSURANCE COMPANY, | ) |
| a Foreign Profit Corporation, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| PROGRESSIVE PLUMBING, INC., | ) |
| | ) |
| Counter- Plaintiff, | ) |
| | ) |
| | ) |
| | ) |

1

vs.                                              )
                                                 )
KELLOG & KIMSEY, INC.,                           )
                                                 )
      Counter-Defendant.                   )
                                                 )
_____                  )
                                                 )
PROGRESSIVE PLUMBING, INC.,                       )
                                                 )
      Counter-Plaintiff,                   )
                                                 )
vs.                                              )
                                                 )
ALLIED WORLD SPECIALTY                           )
INSURANCE COMPANY,                               )
                                                 )
      Cross-Defendant.                     )
                                                 )
_____                  )
                                                 )
ALLIED WORLD SPECIALTY                           )
INSURANCE COMPANY,                               )
                                                 )
      Cross-Plaintiff,                     )
                                                 )
vs.                                              )
                                                 )
PROGRESSIVE PLUMBING, INC.,                       )
                                                 )
      Cross-Defendant.                     )
                                                 )
_____                  )

## **MEMORANDUM OPINION**

      The primary issue is who breached a construction contract and what are the damages in this dispute between a general contractor, Plaintiff Kellogg & Kimsey, Inc. ("K&K"), and its plumbing subcontractor, the Debtor Progressive Plumbing, Inc. ("Progressive"). After a five day trial,[1] at least two failed attempts at mediation, reviewing hundreds of exhibits, and reading 19 deposition transcripts, I conclude that *both* K&K and Progressive breached the agreement and K&K owes Progressive $175,840.13, but that neither party prevailed or may recover attorneys' fees or pre-judgment interest.

---

[1] The trial was held on September 24-28, 2018.

## Overview

K&K brought this adversary proceeding against Progressive and Allied World Specialty Insurance Company ("Allied"), who issued the underlying payment and performance bond (the "Bond"), claiming it is owed damages of approximately $450,000 arising from a breach of a construction subcontract and the Bond. Progressive filed a counterclaim against K&K alleging breach of contract, violation of Tennessee's Prompt Pay Act, Ten. Code § 66-34-101, *et seq.*, and tortious interference with a business relationship seeking around $300,000. Allied filed a counterclaim seeking subrogation and declaratory judgment.[2]

Progressive is a commercial plumbing company based in Clermont, Florida. In February 2013, Progressive subcontracted ("Subcontract")[3] with Sarasota, Florida based general contractor K&K to provide plumbing services and materials to a new construction project already underway in downtown Nashville, Tennessee (the "Project").[4] The Project involved building two adjacent Marriott-branded hotels—a Residence Inn and a Springhill Suites. Allied issued its Bond to guarantee Progressive's performance of the Subcontract for $1,750,000.[5]

The Project broke ground in January 2013. Progressive signed the Subcontract in February 2013. And Progressive employees arrived on site and into a construction maelstrom in March 2013.[6]

The Project was jinxed from the start with forces outside the control of either K&K or Progressive. Nashville was experiencing a building boom in 2013. The city was returning to prosperity after the recession of 2008, but with a greatly reduced labor pool. Skilled construction

---

[2] Allied and Progressive also have crossclaims against each other. Doc. Nos. 12, 20, 35. Because these crossclaims are dependent on the resolution of the issues between K&K and Progressive, they were not ripe for resolution during the trial. Doc. No. 147. A future status conference will address these remaining issues and crossclaims will be held at 2:00 p.m. on January 7, 2020.
[3] Progressive's Exh. 1. The Subcontract was signed on February 22, 2013.
[4] K&K signed the primary construction contract with the owner, Ace Hospitality, Inc., on October 1, 2012. K&K's Exh. 1.
[5] K&K's Exh. 4. The Bond was issued on March 26, 2013.
[6] 9/24/18 Tr. at 77-79.

labor was difficult, if not impossible, to hire due to increased demand.[7]   Builders competed for talented workers often settling for inferior labor options.

And, just as this Project was about to break ground in early 2013, Nashville experienced extreme winter weather causing significant construction delays.   On top of this, the City of Nashville was a difficult working partner and was slow to issue permits or to inspect work.   Utility service connections were delayed.   Marriott also caused further delays by failing to timely specify design and material requirements causing change orders and design alterations late in the construction process. For example, the plans did not include details and Marriott's design team did not timely specify acceptable shower heads until Progressive already had purchased its choice.

Every construction project is unique and brings unexpected problems.   But this Project was fraught with an extraordinary number of hurdles.   Neither K&K nor Progressive responded as quickly or professionally as needed to stop these problems from snowballing into a catastrophe, which is what ensued.

Both parties, however, soldiered on with the Project.   K&K was frustrated with the speed and quality of Progressive's plumbing work (and the work of other subcontractors) but K&K never asked Progressive to leave the site.   No default was declared until November 26, 2014,[8] when construction was almost complete.   K&K obtained a temporary certificate of occupancy for the two hotels on January 28, 2015.[9]   So, the Project was completed; but Progressive's outstanding change orders and contract balance was never paid.

This end-of-project accounting and reconciliation remained unfinished when Progressive filed its Chapter 11 bankruptcy petition on August 24, 2015.[10]   K&K filed an unsecured proof of claim [Claim 35-1] for an outlandishly overstated amount of $813,547.94.[11] Parties went to

---

[7] Progressive's Exh. 48; 51; 54; 57; 61.
[8] K&K's Exh. 414.
[9] 9/24/18 Tr. at 102.
[10] Doc. No. 1 in Main Case No. 6:15-bk-07275-KSJ.
[11] *See* Doc. Nos. 468, 472 in Main Case No. 6:15-bk-07275-KSJ.

mediation twice, but settlement talks failed. K&K filed this adversary proceeding alleging breach of the Subcontract and the Bond and seeks $451,822.60.[12] Progressive filed a counterclaim also alleging breach of the Subcontract and seeks $303,087.01.[13] Progressive also objected to K&K's Claim 35-1,[14] which was consolidated with the trial. The parties submitted post-trial closing arguments,[15] and the job now falls to the Court to determine who breached the Subcontract and what damages are due and by whom. I first will find that both K&K and Progressive breached the Subcontract and then delve into the details of the damage award.

### K&K Failed to Maintain a Practicable Schedule

K&K, as the general contractor, had and breached its primary responsibility to maintain a practicable schedule so the trades working on the Project did not overcrowd one another and so they could access work areas in a proper sequence. The source of K&K's duty is in paragraph 5 of the Subcontract that confirms that K&K is to prepare, maintain, and update the work schedule for the Project.[16] And, if Progressive violated this work schedule, the Subcontract allowed K&K to declare a default and impose damages.[17] Article 3.10.1 of the prime contract between the Owner, ACE Hospitality, Inc. and K&K, which is referenced in the Subcontract, similarly confirms K&K's obligation to properly and timely schedule the work of all trades completing work on the Project.[18]

K&K did prepare work schedules at the beginning of the Project. The Subcontract, for example, attached the initial work schedule, Schedule D, dated January 17, 2013. This original schedule contemplated a completion date of July 16, 2014.[19] The Project, as discussed earlier, was marked by a "volume of large anomalies never before encountered."[20] By the time Progressive

---

[12] K&K's Post-Trial Submission, Doc. No. 257 at 20.
[13] Doc. No. 160, Exh. 2.
[14] Doc. No. 157, ¶1(a); Doc. No. 448 in Main Case No. 6:15-BK-07275-KSJ. *See also* Progressive's Closing Argument Brief, Doc. No. 259; Allied's Closing Argument Brief, Doc. No. 258.
[15] Doc. Nos. 257; 258; 259.
[16] Progressive's Exh. 1, ¶ 5.
[17] *Id*.
[18] K&K's Exh. 1.
[19] K&K's Exh. 7.
[20] 9/25/18 Tr. at 188:14-22; 257:10-13.

started work on the Project in March 2013, the initial schedule *already* was outdated and unworkable.    The Project's completion date was delayed numerous times to October,[21] November,[22] December,[23] and eventually to late January.[24] Yet, K&K never revised the work schedule to keep subcontractors informed and able to schedule their labor and material deliveries. The last schedule provided to the subcontractors was issued on June 15, 2014, which listed another *already* outdated Project completion date of September 30, 2014.[25] Bill Lawson, President of Progressive, who the Court found to be a credible witness, testified these outdated schedules were the only schedules he saw "in this whole project," and those schedules had "nothing to do with reality on the job."[26]  K&K just demanded subcontractors to "speed up" with no consideration of over-stacking trades in one work space or sequencing work tasks, so a preliminary job is completed before the next step starts.  K&K abandoned any effort to effectively schedule subcontractors on the Project and left the subcontractors, including Progressive, with the impossible job of figuring out a way to coordinate their labor with the on-going work of other subcontractors.

The Court finds that K&K substantially and materially worsened the work environment by failing to provide practicable schedules and to revise them at appropriate intervals.  K&K *never* supplied Progressive with a *realistic* work schedule.  And, from approximately August 2014 until substantial completion of the Project on January 28, 2015, there was *no* official schedule of any type for Progressive and the other subcontractors to follow.[27]

The effect of K&K's failure to maintain a practicable schedule was chaos on the job site. During delays, subcontractors, including Progressive, could not act because necessary predicates were not finished (*e.g.*, prior trade work) or available (*e.g.*, electrical power). Mr. Lawson, for

---

[21] Progressive's Exh. 48.
[22] Progressive's Exh. 51.
[23] Progressive's Exh. 57.
[24] 9/25/18 Tr. at 173:18-23.
[25] K&K's Exh. 146; 9/26/18 Tr. at 187:19-188:1.
[26] 9/26/18 Tr. at 164:24-165:4; 165:9-14.
[27] 9/26/18 Tr. at 188:2-5.

example, testified that the Project became so disorganized that carpeting went in before the drywall was finished.[28]

Courts applying Florida law have recognized the importance of maintaining a comprehensive schedule in construction projects.[29] "The key purpose of [] detailed scheduling obligations" is "to provide for the efficient and orderly coordination of the various trade contractors, suppliers, and others performing work on the Project so as to ensure the timely completion of the Project."[30] Failure to do so leads to an "uncoordinated nightmare, with trade contractors tripping over one another and hampering each others' work."[31] "[S]cheduling and sequencing of work is particularly critical to trade contractors at the end of the line . . . whose work is dependent on predecessor trade contractors . . . ."[32] Progressive is one of those "end of the line" subcontractors who was most affected by K&K's failure to properly maintain a work schedule.

It is standard practice in the construction industry to schedule and coordinate work by using the critical path method. "The ordinary practice in construction management is for schedules to be prepared in advance of construction that detail the process and flow of construction of the entire project, specifically providing the start and end dates of the various subcontractors on the different parts of the project."[33] The critical path schedule is important because a subcontractor can know "precisely what crews and equipment will be needed each day on the Project, and the location of their work at any given time."[34] Here, besides failing to provide an overall schedule, David Reed, K&K's senior project manager, admitted that he conducted no formal critical path analysis after he determined that Progressive was behind.[35]

---

[28] 9/26/18 Tr. at 188:6-190:5.
[29] *See* Progressive's Exh. 1 (Paragraph 30 of Subcontract provides that Florida law applies and that the Subcontract should be construed according to the laws of Florida).
[30] *See Elec. Mach. Enters., Inc. v. Hunt Constr. Grp., Inc. (In re Elec. Mach. Enters.)*, 416 B.R. 801, 817 (Bankr. M.D. Fla. 2009).
[31] *See id. at 821.*
[32] *Id.* at 823.
[33] *Id.* at 822.
[34] *Id.*
[35] 9/25/18 Tr. at 196:16-18.

K&K breached the Subcontract to Progressive (and likely similar agreements with other subcontractors) by failing to live up to its side to the bargain—to properly maintain and update a practicable schedule or establish a critical work path that would allow the subcontractors to properly do their jobs.

### Progressive Failed to Maintain and Supply Adequate Labor

K&K was not alone, however, in failing to live up to its responsibilities under the Subcontract. Progressive also breached the Subcontract by failing to maintain and supply adequate labor. Paragraph 6 of the Subcontract states:

> **Materials, workmen, and supervision:** …Subcontractor must at all times maintain, keep and supply adequate tools, appliances, equipment, and material and employ a sufficient number of properly skilled workmen to efficiently and promptly execute all Work required hereunder. All labor used throughout the Work by Subcontractor shall be properly licensed and acceptable to Owner, Architect and Contractor and of a standing or affiliation that will permit the Work to be carried out harmoniously and without delay and will in no case or under any circumstances cause any disturbance, interference, or delay to the progress of the Work…[36]

Progressive's failure to supply adequate labor was caused by many reasons including a labor shortage in the Nashville market, poor management decisions, miscommunication between Progressive's local labor force and its distant management in Florida, and cycling through five difficult and frustrated superintendents in Tennessee.[37] As early as May 2014, Mr. Reed emailed Progressive to complain about the work being done by Progressive's workers and to suggest that Progressive supplement its labor force.[38]

Progressive made extraordinary efforts to find sufficient labor to properly staff the Project, but they failed. Progressive hired a local plumbing company, Mazzeo Plumbing to supplement its

---

[36] Progressive's Exh. 1, ¶ 6.

[37] Progressive's five superintendents include:  Boyt Burns (March 2013 – April 2014) (K&K Exh. 251; 9/24/18 Tr. at 92); Joe Uselton (Fired in June 2014) (9/27/19 Tr. at 88-89); Mike Hartesy (9/26/18 Tr. at 105); Dwight Hollifield; (9/26/201 Tr. at 149-50), and Calvin Robinson, who finished the Project. (K&K's Exh. 261).

[38] *See, e.g.*, K&K's Exh. 88; 112; 148; 166; 173.

work force in Tennessee.[39] But, Mr. Mazzeo was removed from the job site after an altercation with K&K's lead superintendent, Damian Schnapf.[40] Progressive also employed day laborers supplied by two Tennessee companies, Tradesman International and Labor Finders.[41] In June 2014, Progressive contacted the Tennessee Federal Prison Work Release Program "to see if they have any help, hopefully plumbers we could use."[42]

Simultaneously, Progressive was moving the labor they had in Tennessee to other job sites. Progressive's first on-site superintendent, Boyt "Bo" Burns, testified that, beginning shortly after he arrived at the Project, Progressive's management in Florida routinely diverted him and his crew to other job sites for days or weeks at a time.[43] The Court cannot determine whether this labor diversion was due to chaos on the Project site caused by K&K failure to properly schedule the subcontractors on the Project or due to work demands on other Progressive job sites. But, without a doubt, Progressive breached their obligation under the Subcontract to "employ a sufficient number of properly skilled workmen to efficiently and promptly" do their job.[44]

Besides the lack of labor force, Progressive's workers did a poor job. Mr. Burns observed poor plumbing workmanship throughout his tenure, describing the attitude of his crew as: "Just slapping work together and not having any workmanship. Just basically hurry up and put it together and get on out of here."[45] Mr. Mazzeo testified that "90 percent" of Progressive's plumbers were "incompetent."[46] Another Progressive superintendent, Dwight Hollifield, testified that he encountered "a mess" the moment he walked onto the job site.[47] Progressive's workers, for

---

[39] Progressive's Exh. 79.
[40] 9/27/18 Tr. at 63-66.
[41] 9/26/18 Tr. at 47.
[42] K&K'S Exh. 143.
[43] Doc. No. 120. Burns' Deposition, p. 22; 29.
[44] Progressive's Exh. 1, ¶ 6.
[45] Doc. No. 120. Burns' Deposition, p. 79.
[46] Doc. No. 122. Mazzeo's Deposition, p. 146.
[47] Doc. No. 148. Hollifield's Deposition, p. 14.

example, failed to complete test work,[48] improperly or failed to install material,[49] and caused an electrical rupture.[50]

And, Progressive failed to timely supply plumbing materials to the Project as provided under Paragraph 6 of the Subcontract, which requires Progressive to "maintain, keep and supply adequate…material…to efficiently and promptly execute all Work."[51]  Mr. Burns described ordering needed materials as "headache after headache," and said that failing to timely receive materials hampered his crew "frequently."[52] Mr. Mazzeo also testified about delays caused by Progressive's failure to timely supply needed materials.[53]

Progressive's labor issues were exacerbated by miscommunication between the field superintendents and Progressive's management in Florida. Progressive hired five superintendents over the two-year Project and this frequent change of onsite leaders from Progressive's side created many problems and construction delays. Progressive's distant administration in Florida, its cyclical replacement of superintendents in Tennessee, the understaffing of the Project with unskilled labor, and the lack of attention by Progressive's management all resulted in a breach of Progressive's duties under the Subcontract.

### K&K Supplemented Progressive's Labor in Violation of the Subcontract

When Progressive could not properly staff the Project, Mr. Reed told Mr. Lawson at Progressive that K&K intended to supplement Progressive's forces.  On August 20, 2014, Mr. Reed wrote to Mr. Lawson stating that he had failed to "adequately man" the Project and K&K

---

[48] K&K's Exh. 73 (Mazzeo emailed Progressive's principal, Bill Lawson, stating that there was "a constant pattern of non-testing on this jobsite" and that Progressive's workers "had no intention of testing the DWV lines.").
[49] Doc. No. 122. Mazzeo's Deposition, p. 25; Doc. No. 148. Hollifield's Deposition, p. 19.
[50] Billy Lawson Jr. admitted that he caused the line to rupture by using electrical conduit, rather than water piping, to attempt a repair of a previous blown fitting. *See* 9/27/18 Tr. at 88 ("I was tired and there was some electrical conduit and there was…all kinds of pipe and it was just a mistake.")).
[51] Progressive's Exh. 1.
[52] Doc. No. 120. Burns' Deposition, p. 27; 53.
[53] Doc. No. 122. Mazzeo's Deposition, p. 134 ("I can't send manpower to do a job to do the work if there's no material there to work with."); K&K's Exh. 165 (Mazzeo-to-Lawson email: "Material on this job has also been an issue since day one. I have had to go and purchase material out of my own pocket to finish up work on your job. That is pathetic.").

was "actively searching for supplemental manpower for your crew and will deploy the first available found."[54]   On September 3, 2014, Mr. Reed informed Progressive that K&K was exercising its "right to supplement your forces commencing tomorrow am.  I will have at least one additional journeyman plumber here, possibly two and will add all that I can find as they become available."[55]

K&K then contracted with two companies, Trillium Construction (initially) and (later) Hospitality Plumbing, to provide supplemental plumbing work on the Project starting on September 4, 2014.[56] Progressive got *no* information as to the number of workers K&K was hiring or the specific tasks they were hired to complete.  K&K simply added workers at the Project site without informing Progressive of the number of new workers, their training, or the tasks they were hired to complete.

Exhibit B to the Subcontract specifies when and how K&K could supplement Progressive's forces and then require Progressive to bear that cost:

> In the interest of maintaining the overall project schedule, should Contractor require Subcontractor to increase Subcontractor's current workforce; specifically intended to mean an increase in Subcontractor's direct skilled manpower count; at any given time through the course of this agreement, Subcontractor agrees to provide additional manpower in the number of additional workmen added to the already established daily workforce who will be deployed within specific areas of the workplace and within the Subcontractor's work scope as directed by the Contractor in both count of added personnel and area of deployment. Subcontractor shall without challenge or delay of argument add the requested number of additional personnel of appropriate skill level necessary to execute the specific scope assignments to the project within 24 hours of contractor's written demand and will maintain such staff additions until such time as Contractor advises the supplemental workforce is no longer necessary as a result of production schedule restoration.…[57]

---

[54] K&K's Exh. 230. *See also*, K&K's Exh. 251, email from Mr. Reed to Mr. Lawson dated August 28, 2014. (Mr. Reed states Progressive is "grossly understaffed in terms of both manpower and supervision.").
[55] K&K's Exh. 259.
[56] K&K's Exh. 542; 543.
[57] Progressive's Exh. 1 at Subcontract Exhibit B, p. 5.

Under this provision, K&K could supplement Progressive's work "[i]n the interest of maintaining the overall project schedule." Supplementation was supposed to last only until "production schedule restoration." K&K, however, made no "overall project schedule" after June 2014, and it is unclear how K&K could effectively determine the Project's specific needs without a comprehensive schedule or without conducting a formal critical path analysis.

K&K also had to give Progressive 24-hour notice prior to any labor supplementation. And, K&K had to tell Progressive the number of additional workers that K&K required and the specific areas where the additional workers were to be deployed.[58] The Court expressly finds that K&K's emails to Progressive about K&K's desire that Progressive increase its manpower did not meet the contractual obligation of K&K to furnish a 24-hour written demand for a particular number of workers to be deployed to specific areas on the construction site.

The reason for this notice requirement is obvious. Progressive needed to know how many workers would show up each day and for what purpose so Progressive could manage its existing crew. By K&K independently adding laborers in an unknown number and for undefined tasks, Progressive had no ability to manage its plumbing work day-by-day. K&K did not provide Progressive (or Allied) with the opportunity to seek alternative workforce. Instead, they hired new subcontractors, perhaps paying them more than the actual cost of labor.[59]

Mr. Lawson credibly testified that he knew Trillium workers were on site, but that he "didn't know what they were costing," nor "how many we were going to get from day to day," and that Progressive got "zero information."[60] To make matters worse, K&K did not tell Mr. Lawson it had hired yet another subcontractor at Progressive's expense — Hospitality Plumbing.[61] Mr. Lawson only learned about Hospitality Plumbing labor post-petition.[62] Mr. Reed confirmed

---

[58] *Id.*
[59] *See* 9/26/18 Tr. at 159:22-24.
[60] 9/26/18 Tr. at 152:22-25.
[61] 9/27/18 Tr. at 68:2-69:23.
[62] 9/27/18 Tr. at 68:2-69:23.

this when he testified that he never sent a copy of the Hospitality Plumbing invoice to Progressive until K&K filed its Proof of Claim.[63] Ms. Kim Sapp, CFO and Treasurer of Progressive, further testified she saw no timecards, daily tickets, or any documentary evidence of the work Hospitality Plumbing completed.[64] Mr. Reed himself admitted there were no timecards.[65]

K&K breached its duties under the Subcontract because it provided none of this information before hiring supplemental labor supplied by Trillium Construction and Hospitality Plumbing. K&K usurped Progressive's role in hiring extra workers without informing them of how many workers were hired, what K&K expected these workers to do, or how much they cost. K&K also failed to inform Allied, Progressive's surety, of K&K's labor supplementation until a formal notice of default was issued on November 26, 2014.[66]

The price for this supplemental labor is the largest single component of K&K's alleged damages. K&K seeks to recover from Progressive reimbursement of labor charges totaling $214,200.49, consisting of $173,425.49 paid to Trillium Construction, and $40,775 paid to Hospitality Plumbing.[67] K&K did not know or keep track of what their workers provided by Trillium Construction and Hospitality Plumbing were doing. Mr. Reed admitted, for example, that Progressive, not K&K, supervised the Trillium workers.[68] But Progressive never knew who was assigned to them, the skill levels of the assigned labor, or what they were hired to do. The clear implication is that neither K&K nor Progressive directed these workers to any specific assignments.

As to Hospitality Plumbing, Progressive was not aware they worked on the Project until after this bankruptcy case was filed. Mr. Reed confirmed that he never sent a copy of the

---

[63] 9/25/18 Tr. at 209:13-210:3.
[64] 9/27/18 Tr. at 125:21-126:15.
[65] 9/25/18 Tr. at 205:3-5.
[66] K&K's Exh. 414.
[67] K&K's Exh. 542; 543.
[68] 9/25/18 Tr. at 199:3-5.

Hospitality invoice to Progressive until K&K filed its Proof of Claim.[69] The Court is unclear who, if anyone, managed the labor supplied by Hospitality Plumbing.

K&K failed to mitigate damages and exercise ordinary and reasonable care when it hired outside supplemental labor without limiting the supplementation to remediate specific issues, as required by the Subcontract.[70]   K&K offered three exhibits with documentary "proof" of these supplementation costs,[71] but these exhibits include only generic invoices and proof of payment. The invoices include almost no information about what the workers were doing, for whom, and at what times and days.[72] Because K&K failed to properly give advance notice to Progressive day-to-day of the number and nature of supplemental laborers K&K hired, as required by the Subcontract, and failed to document what tasks these workers accomplished, K&K may not recover its request for supplemental labor costs of $214,200.49.

### Neither K&K nor Progressive is a Prevailing Party

The Project was riddled with problems from the outset. Some problems were external— the extreme winter weather, Nashville building boom following a national recession, and the resulting poor labor market.  Other problems were self-inflicted by K&K and Progressive.  K&K failed to revise the work schedule, creating chaos from the inception of the Project.  Progressive failed to properly staff the job or to insure the timely delivery materials to the worksite.  K&K then randomly supplemented Progressive's workforce without notice of the number or qualifications of these extra workers, and did not specify what the workers were hired to do.  Both parties materially breached the Subcontract and share responsibility for the resulting damages.

---

[69] 9/25/18 Tr. at 209:13-210:3.
[70] *See Sys. Components Corp. v. Fla. Dep't of Transp.,* 14 So.3d 967, 982 (Fla. 2009) ("The doctrine of avoidable consequences . . . commonly applies in contract and tort actions . . . does not permit damage reduction based on what 'could have been avoided' through Herculean efforts. Rather, the injured party is only accountable for those hypothetical ameliorative actions that could have been accomplished through 'ordinary and reasonable care,' without requiring undue effort or expense.") (internal citations omitted)).
[71] K&K's Exh. 352; 542; 566.
[72] 9/27/18 Tr. 125:21-126:15 (*E.g.*, Mr. Reed admitted that Hospitality did not keep timecards).

To determine who is the "prevailing party" under Florida law,[73] a court must decide which party "prevailed on significant issues."[74] It may be proper to find that neither party prevailed on significant issues or that both parties prevailed on significant issues. Recovering a net judgment also does not render that party a "prevailing party."[75] Florida courts consistently have held that although "[p]revailing party attorney's fees are just and proper in the majority of contract litigation," it may be proper to find no prevailing party when the effect is "an unjust reward to a party whose conduct caused the failure of the contract."[76] In *KCIN v. Canpro*, the Second District Court of Appeals stated that a court may find there is no prevailing party when both contributed to the breach of the contract:

> Prevailing party attorney's fees are just and proper in the majority of contract litigation. We are concerned, however, with contracts that fail as a result of fault by both contracting parties. A rule which requires an award of prevailing party attorney's fees in all cases may result in an unjust reward to a party whose conduct caused the failure of the contract.[77]

Similarly, in *Lasco Enterprises,*[78] the Fifth District Court of Appeals upheld the decision of the trial court awarding no fees to either party when they were both at fault. The Florida Supreme Court also has recognized in a construction case that sometimes neither party will prevail and that "appellate courts have upheld decisions where the trial court found no prevailing party under the 'significant issues' test in breach of contract litigation.'"[79]

Here, although the Court will award Progressive a relatively small monetary judgment, obtaining a net judgment is "not determinative of whether that party is the 'prevailing party' for

---

[73] *See* Progressive's Exh. 1 (Paragraph 30 of Subcontract provides that Florida law applies and that the Subcontract should be construed according to the laws of Florida).

[74] *Trytek v. Gale Indus., Inc.*, 3 So. 3d 1194, 1204 (Fla. 2009).

[75] *Id.* at 1201.

[76] *KCIN, Inc. v. Canpro Invs., Ltd.*, 675 So.2d 222, 223 (Fla. 2d DCA 1996).

[77] *Id.*

[78] *Lasco Enter., Inc. v. Kohlbrand*, 819 So. 2d 821, 826 (Fla. 5th DCA 2002).

[79] *Trytek*, 3 So. 3d at 1203 n. 12 (citing *Brevard County Fair Ass'n v. Cocoa Expo, Inc.,* 832 So.2d 147, 151 (Fla. 5th DCA 2002) (where both parties prevail on significant issues, the trial judge has the discretion to determine neither party prevailed); *Hutchinson v. Hutchinson,* 687 So.2d 912, 913 (Fla. 4th DCA 1997) (recognizing that there can be "compelling circumstances" in which a trial court can determine that neither party prevailed in a contract case)).

purposes of entitlement to attorneys' fees."[80] Attorneys' fees were estimated by the parties to exceed $1 million *before* the five-day trial began and they filed 50+ page closing arguments. The Subcontract ultimately failed because of fault of both parties. It would be unfair to award attorney's fees to one side when both K&K and Progressive equally are culpable for their failures on the Project and their breaches under the Subcontract.

The same rationale applies to the award of pre-judgment interest. In K&K's case, they sought pre-judgment interest of $168,939.40 at 18% per annum from May 20, 2015.  A party who prevails in a contract dispute traditionally receives prejudgment interest.[81] But, "the law is not absolute and may depend on equitable considerations."[82] "The decision whether to refuse or reduce prejudgment interest, that is, how to balance the equities, is within the trial court's sound discretion."[83] The Florida Supreme Court also has recognized that "interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable."[84] Here, the Court finds it would be inequitable to award prejudgment interest to either party because both substantially breached the Subcontract.

The Court declines to find a prevailing party vis-à-vis K&K and Progressive and will decline to award either party their attorneys' fees, costs, or pre-judgment interest.

## Summary of Damages Sought for Breach of the Subcontract

So, after disallowing K&K's damages for labor supplementation of $214,200.49, and both parties' request for attorneys' fees, costs, and pre-judgment interest, what damages remain that were caused by each parties' breach of the Subcontract?  Before delving in the details of this damage calculation, let me stop for a moment to acknowledge the difficulties both parties

---

[80] *Trytek*, 3 So. 3d at 1202.
[81] *Blasland, Bouck & Lee, Inc. v. City of North Miami*, 283 F.3d 1286, 1297(11th Cir. 2002).
[82] *Id*. (quoting *Broward Cty. v. Finlayson*, 555 So.2d 1211, 1213 (Fla. 1990)).
[83] *Id*. at 1298.
[84] *Broward Cty. v. Finlayson*, 555 So. 2d 1211, 1213 (Fla. 1990).

encountered on this Project.    Both K&K and Progressive are professional, experienced construction companies used to completing complicated commercial projects timely and competently.    They both had a strong desire to do a good job in building these two hotels in Nashville but forces outside of their control got away from them.    Neither K&K nor Progressive reacted promptly to get this Project back on track or to figure out a solution to the mounting obstacles.    They both missed the mark; they both breached the Subcontract; and each party is responsible for the detritus and extra costs that followed.

Both parties agree K&K owed $191,979.54 to Progressive under the Subcontract and undisputed change orders[85] when the Project ended.    Progressive acknowledges K&K is owed $42,000 for a charge to a contractor (ASDT) hired by Progressive but not paid.[86]    So, the parties agree K&K owed Progressive a net amount of $ 149,979.54.

K&K seeks damages from Progressive totaling $175,658.51[87] comprised of these four components:

- $9,254.75 owed to Tradesman International, LLC, who was hired but not paid by Progressive;

- $66,224.82 owed to various contractors hired by K&K;[88]

- $73,679.94 for supplemental labor provided by K&K's own workforce;[89] and

- $26,499.00 for an indemnity payment made to the owner of the Project.

---

[85] K&K acknowledges Progressive is entitled to payment for Change Order Requests 7 ($2,882.00), 8 ($8,246.28); 27 ($166.15), and 33 ($349.75), totaling $11,644.18.  K&K Exh. 501.  In addition, K&K admits Progressive is entitled $12,736.09, which awards 25% of the requested amounts on Change Order Requests 10, 14, 15, 16, 17, 19, 20, 23, 24, 29, 31, 32, and 34.

[86] K&K's Exh. 459.

[87] The damage calculations submitted by both parties are very confusing. But a reader may want to skim K&K's Exh. 541 for an early summary of the damages K&K seeks.

[88] K&K seeks reimbursement for amounts paid ($54,731.25) to various contractors hired by K&K but for which it argues Progressive should pay.  In addition, under the Subcontract, K&K argues that it is entitled to receive an additional 10% in overhead ($5,473.13) and 10% in profit ($6,020.44).

[89] K&K used its own labor to complete certain work and now seeks payment from Progressive of $60,892.51 together with an additional 10% in overhead ($6,089.25) and 10% in profit ($6,698.18).

Progressive disputes, sometimes feebly, that it owes no amounts.  And Progressive contends K&K owes it $111,107.47 for valid but disputed change orders.

So, to put the damage calculation in perspective, both parties agree Progressive is owed $149,979.54 under the Subcontract.   And to this amount, there will be a credit or a debit depending on the calculation and award of the breach of contract damages sought by Progressive ($111,107.47) or K&K ($175,658.51).  As in life, both K&K and Progressive will "win some and lose some" as I will explain in the next two section discussing the details of K&K's and Progressive's breach of contract damages.

## K&K's Damages

### *Tradesman International Charge - $9,254.75*

Progressive hired workers from Tradesmen International, LLC but never paid them.  K&K now seeks reimbursement for the claim of lien, dated December 1, 2014, Tradesman placed on the Project property for unpaid invoices totaling $9,254.75.[90]

K&K, however, has made no payment on the lien.[91] Nor will it ever be required to make a payment.  Mr. Reed testified that K&K was required under the prime contract to "either pay it or bond it off."[92] And K&K chose to "bond it off," which Reed explained means to transfer the claim to a bond from the property.[93] Under Tennessee law, the Tradesman's lien expired ninety days after it was recorded.[94] K&K offered no evidence to show that Tradesmen attempted to enforce its lien or otherwise make a claim against K&K's payment bond, nor does the record reflect a payment of any kind to Tradesmen. K&K is not entitled to any damages attributable to the Tradesman claim of lien.

---

[90] K&K's Exh. 541.
[91] 9/25/18 Tr. 8:13-23.
[92] 9/25/18 Tr. 8:13-16.
[93] 9/25/18 Tr. 8:17-23. K&K's Exh. 560.
[94] *See* TENN. CODE ANN. § 66-11-115(b).

*Reimbursement for Contractors Hired by K&K - $66,224.82*

K&K seeks $66,224.82, for charges paid by K&K to contractors K&K hired because Progressive failed to properly perform or to fix a problem. Some charges are allowed; others are denied. I will address the two largest charges first—United Rentals and MPL

*United Rental.* K&K seeks reimbursement of $17,931.18, for charges paid to United Rental for rental equipment allegedly used by Progressive on the Project.[95] K&K argues there was an "informal agreement" between K&K and the other skilled contractors, the "MEP" contractors who install mechanical, electrical, and plumbing systems, to share the rental costs of a skid-steer loader.[96] Mr. Reed acknowledged there was no written document reflecting the agreement but testified other contractors "willingly accepted their portions."[97] The Court found this testimony insufficient to shift the liability to Progressive. K&K failed to establish how, when, or for what purpose Progressive used this rental equipment, the existence of any agreement to split the rental costs, or a legal basis for require Progressive to pay any portion of this expenses. K&K is entitled to no damages attributable to the United Rental charge.

*MPL Charge.* K&K is seeking $25,385.00, for the cost of purchasing shower bases for Spring Hill Suites.[98] Exhibit B of the Subcontract provided in the "CLARIFICATIONS" section that Progressive would provide "Florestone shower bases or equal" in Spring Hill Suites.[99] Based on this provision, Progressive included $12,972.00 in the contract price for the purchase of 94 Florestone shower pans at $138.00/each.[100] Marriott's design team, however, rejected the shower base selected by Progressive and insisted on using a more expensive one.[101] K&K purchased the

---

[95] K&K's Exh. 539.
[96] 9/25/18 Tr. at 103:2-104:3.
[97] 9/25/18 Tr. 212:5-10.
[98] K&K's Exh. 555.
[99] *See* K&K's Exh. 3.
[100] 9/27/18 Tr. at 86:10-12.
[101] 9/25/18 Tr. at 136:17-18.

alternative shower pans from MPL and seeks payment from Progressive of the entire purchase price - $25,385.00.[102]

Progressive included $12,972.00 in the Subcontract to pay for the shower pans and it is not responsible for the up charge when the Owner, at Marriott's direction, selected a more expensive version of the shower pan. Progressive must pay the portion of the cost included in the contract ($12,972.00), but no more. K&K is entitled to limited reimbursement from Progressive for $12,972.00 for the shower pans it purchased from MPL.

*Georgia Air Contractors*. K&K claims that Progressive is liable for a $1,672.00 payment made to Georgia Air Contractors because GAC had to make a second trip to the Project to turn on gas.[103] The evidence, however, suggests that K&K always contemplated two visits would be required because the make-up air units were scheduled to be turned on *before* the gas units.[104] K&K failed to prove Progressive breached any duty and is not entitled to reimbursement for this second visit charge paid to Georgia Air Contractors.

*Allowed Reimbursements of $9,743.07*. K&K next seeks reimbursements for charges paid to six contractors to either fix problems caused by Progressive's poor performance or for other similar charges, such as a reinspection fee by the City of Nashville. Some of these are small charges. Others Progressive does not dispute. And, as to them all, the Court, after reviewing the evidence, concludes that Progressive rightfully should bear the cost K&K incurred to fix problems caused by Progressive. So, without further discussion, K&K is allowed reimbursement from Progressive of $9,743.07, for payments made by K&K to these six entities in these amounts: (1) $100.03 to Transfac Capital;[105] (2) $276.18 to Metro Nashville;[106] (3) $2,010.00 to Tile Pro;[107]

---

[102] 9/25/18 Tr. at 136:23-137:1; K&K's Exh. 555.
[103] 9/25/18 Tr. at 140:1-2, 10-20.
[104] *See* K&K's Exh. 146-47.
[105] 9/25/18 Tr. at 105:25-106:9; K&K's Exh. 545.
[106] 9/25/18 Tr. at 107:4-13; K&K's Exh. 545.
[107] K&K's Exh. 548; 9/25/18 Tr. at 119:10-11; 9/26/18 35:23-38:5.

(4) $1656.86 to Acousti;[108] (5) $4,650.00 to Eastern Corp.,[109] and (6) $1,050.00 to All Shore Flooring.[110]

### *Supplemental Labor Supplied by K&K's Workers - $73,679.94*

K&K seeks to shift the cost of its own labor to Progressive arguing it had to use its own worker to complete work Progressive should have finished.  The back charges are for concrete work ($9,588.00), drywall and cabinetry work ($26,560.00), paint and vinyl work ($21,631.25), and drying room use ($3,113.26).  The total requested is $73,679.94.[111]  To support these charges, K&K submitted four self-serving and inadmissible exhibits, Exhibit Numbers 547, 550, 551, and 553, which contain after the fact narratives and estimates—really guesstimates—of the services K&K workers *may* have supplied to help Progressive finish the job.[112] And, Mr. Reed could provide no valid legal basis to allow these back charges.[113]   K&K submits no time records, no invoices, no daily tickets, or no receipts to support these substantial requested charges. K&K may not have reimbursement for these back charges performed by K&K's own workforce.

### *Owner Indemnity Payment - $26,499.00*

K&K argues that Progressive should reimburse K&K $26,499.00, for legal fees allegedly incurred by the Owner, ACE Hospitality, Inc., in two lawsuits involving Progressive—one involving ASDT, the contractor hired but not paid by Progressive, and the second lawsuit filed by Progressive in Tennessee.  In support, K&K submits Exhibit 557, which includes two incomplete indemnification agreements between K&K and the Owner, a billing history chart, and a single email between counsel for K&K and counsel for the Owner.  This email states, "K&K accepts a credit for all of the Owner's fees related to the ASDT lawsuit and the Progressive lawsuit" but

---

[108] 9/25/18 Tr. at 132:1-16; K&K's Exh. 552.
[109] K&K's Exh. 549.
[110] 9/25/18 Tr. at 134:14-135:14; K&K's Exh. 554.
[111] This amount includes the additional 10% in overhead ($6,089.25) and 10% in profit ($6,698.18).
[112] FED. R. EVID. 603; 801(c); 802.
[113] 9/25/18 Tr. at 127:6-7; 218:12-20.

does not otherwise define the pending litigation or substantiate any attorneys' fees incurred by the Owner.

K&K simply fails to prove this charge. The billing history admittedly reflects a deduction of $26,499.00, but the charge is attributable to "Warranty Costs," not attorneys' fees. There is no proof of payment, no final agreement, no settlement document, no closing statement, and no other document that would substantiate that Progressive is responsible for this charge. And, the only testimony on the issue came from Ed Doughty, K&K's Chief Financial Officer, who could not credibly explain these figures.[114] K&K is not entitled to reimbursement by Progressive of this alleged indemnity claim.

To wrap up the damages due to K&K from Progressive, K&K may recover $22,715.07 attributable to $12,972.00 paid to MPL for the shower pans, and $9,743.07 to the six contractors paid to fix Progressive's mistakes. The Subcontract[115] provides in Paragraph 18 that K&K may recover 10% overhead and 10% profit on this amount making the final award Progressive owes to K&K $27,485.23.

### **Progressive's Damages**

Progressive seeks $111,107.65 in *disputed* change order requests ("COR"). K&K lists these disputed COR's and their partial allowance or disallowance in their Exhibit 501. The disputes fall into three general categories, some of which overlap.

First, K&K *partially approved* several COR's, totaling $50,944.74, but arbitrarily allowed only 25% of the requested charges ($12,736.09). So, the 75% difference, $38,208.65, requested in this partially allowed COR's remains in dispute.

---

[114] 9/25/18 Tr. at 45:20-41:19.
[115] Progressive's Exh. 1.

Second, K&K *totally disallowed* ten COR's totaling $72,899. Adding the amount requested by COR's falling into these two categories equals the $111,107.65 sought by Progressive ($38,208.65 + $72,899.00 = $111,107.65).

Third, K&K disputes Progressive is entitled to a *54% "labor burden,"* totaling $19,475.38, requested in some of the disputed COR's.  This requested extra charge is included in both the partially approved and totally disallowed COR's categories.  So, I will discuss this category last, after analyzing Progressive's damages under the submitted but disputed COR's.

### *Partially Approved COR's (10, 14, 15, 16, 17, 19, 20, 23, 24, 29, 31, 32, 34)*

K&K agrees Progressive is entitled to payment on each of the Partially Approved COR's. K&K, however, rejected the amount requested and arbitrarily reduced each COR by 75%, resulting in a remaining disputed amount of $38,208.65.  At trial, K&K acknowledged this reduction was arbitrary.

To provide one example, Progressive's COR 10,[116] 19,[117] and 20[118] each relate to relocating a boiler room sanitary line already properly installed by Progressive.  K&K asked Progressive to move the sanitary line,[119] which constituted a change directive under paragraph 14 (titled "Changes") of the Subcontract for the subject of COR 10 and 19.[120] Progressive had to dig up the installed line, put in a new line, and then move the boiler connections due to a mistake made by the Project's mechanical engineer.[121] K&K issued a written change directive telling them to do this.[122]  These were design errors were caused by K&K; the new work was directed by K&K; and Progressive should be compensated for fixing it. K&K acknowledges Progressive is entitled to payment, but just says the charges are "too high."  Nothing in the record supports a 75% reduction.

---

[116] Progressive's Exh. 13; 14.
[117] Progressive's Exh. 23.
[118] Progressive's Exh. 24.
[119] 9/25/18 Tr. at 61:10-11.
[120] *See* K&K's Exh. 3.
[121] 9/25/18 Tr. at 58:18-19; 58:24-59:18; 9/26/18 Tr. at 212:19-213:25.
[122] Progressive's Exh. 24.

A second example is COR 14,[123] in which Progressive asked $2,673 to purchase and install OS&Y valves for the back-flow preventers.  K&K acknowledges the Project plans called for "gate" valves, but that the City of Nashville instead required "OS&Y" valves.[124] K&K, through Mr. Reed, further agreed that the new valves were more expensive to buy and install and that Progressive was entitled to payment under the change order, but argues the cost was overstated.[125]  Similar to the other Partially Approved COR's, K&K then arbitrarily reduced the amount by 75%.[126]

K&K articulated no credible basis for an across the board cut of 75%.  Progressive followed the same procedure as it did for earlier change order requests that K&K approved in full.  The only difference, in my opinion, is that, by the time these COR's were submitted, construction was finished, and the parties had moved into a litigation stance.  K&K simply was banking a future negotiating chip by refusing to pay legitimate COR's to assist with future settlement efforts.  The record is devoid of any credible reason K&K refused to allow in full the COR's that fall into the Partially Approved category, including COR's 10, 14, 15, 16, 17, 19, 20, 23, 24, 29, 31, 32, 34.  Progressive may have payment of $38,208.65, attributable to K&K's arbitrary 75% reduction of the Partially Approved COR's.

### *Totally Disallowed COR's (9, 11, 12, 18, 21, 22, 25, 26, 28, 30)*

K&K disputes allowing ten COR's in any amount, primarily contending the Subcontract required Progressive to complete the work with no extra payment.  I will analyze each of ten COR's in succession.

*COR 9*.  Progressive submitted COR 9[127] for costs of $17,159.82, related to rock removal.  Mr. Reed rejected this COR immediately upon its submission in April 2014,[128] contending Progressive should have offset this cost for rock removal against an undocumented and

---

[123] Progressive's Exh. 18.
[124] 9/26/18 Tr. at 218:1-16; 9/25/18 Tr. at 66:21-23; K&K Exh. 501.
[125] 9/25/18 Tr. at 68:1-9.
[126] K&K's Exh. 501.
[127] Progressive's Exh. 12.
[128] 9/25/18 Tr. at 49:15-19; 51:20-52:11.

unquantified back charge for costs allegedly incurred by K&K for excavating grease traps in the hotel's kitchen area.[129]   The note in K&K's Exhibit 501 states, "Rejected – this is more than offset with GC grease trap install."

K&K's rejection of COR 9 was improper.   The Subcontract did not shift the burden of rock removal to Progressive.   K&K specifically had to provide additional compensation to Progressive for "rock removal for underground piping."[130]  And, although K&K *may* have had a charge against Progressive for damages relating to the grease trap excavation, arbitrarily imposing an offset and denying a proper charge for work Progressive was not required to complete is unwarranted.   And, K&K never credibly established or quantified any costs directly associated with the grease trap excavation. COR 9 is approved in full—$17,159.82.

*COR 11 and 21*.  In COR 11 and 21,[131] Progressive seeks payment for costs to repair underground sanitary and storm drains damaged during construction.  The Subcontract required Progressive, however, to protect its work and imposes responsibility on Progressive to "replace or repair…, at no expenses to Contractor, any damage to its Work which occurs prior to final acceptance thereof by Contractor and Owner."[132]  Here, Progressive failed to protect its work and is responsible for all costs of repair.  COR's 11 and 21 are disallowed.

*COR 12*.  Progressive's COR 12 requests additional payment of $4,823.66, for drywall blowout patches required in 39 locations in the Spring Hill Suites.[133]  The wall adjacent to the tub in the Spring Hill Suites bathrooms was designed as a 6"-wide stud wall but later was changed by the Owner's design team to a 3 5/8" stud wall.[134]  K&K had acknowledged that "trying to squeeze the 3" line in that (3 5/8") wall would be incredibly difficult."[135]  The margin for error to insert a

---

[129] *Id.*
[130] K&K's Exh. 3.
[131] Progressive's Exh. 15; 25.
[132] Progressive's Exh. 1, ¶ 3.
[133] Progressive's Exh. 16.
[134] Progressive's Exh. 44.
[135] *Id.*

3" pipe went from a generous 6" space to a very confined 3 5/8" space.  Progressive bid on this Project assuming a large wall space but was forced to work in the reduced area.  Progressive is entitled to receive payment for the harder job it did not anticipate.  COR 12 is allowed in full—$4,823.66.

*COR 18*.  Progressive seeks $8,058.67 in COR 18[136] for the extra cost to purchase 255 special showerheads demanded by the Owner.  Mr. Reed admitted that the fixture schedule in the specifications manual was silent on shower heads, shower valves, and faucets and those items were supposed to be determined by the interior designer "at a later date," although they never were specified.[137]  The architect and design team never selected the shower heads until after Progressive had ordered versions they believed acceptable.[138]  The Owner then rejected these showerheads, and Progressive had to buy more expensive alternatives acceptable to Marriott and the Owner.  K&K now argues Progressive should have asked for more information before purchasing any showerheads, and while this may have avoided confusion, it offers no reason Progressive may not have payment for showerheads it undisputedly installed in the Project at K&K's and the Owner's insistence.  COR 18 is allowed in full—$8,058.67.

*COR 22, 25 and 30*.[139]  Progressive requests $13,606.36, to replace sinks and toilets broken on the jobsite, $3,399.23 to repair chipped bathtubs, and $1,377.16 to clean grout from installed tubs.  K&K argues, similar to COR 11 and 21, the Subcontract requires Progressive to protect its materials until installed and accepted by the Owner.  Mr. Reed explained that he denied these charges due to "the way [Progressive] were handling them was so careless and haphazard and flew

---

[136] Progressive's Exh. 22.
[137] 9/24/18 Tr. at 179:8-23; 182:11-13; 182:23-25.
[138] 9/24/18 Tr. at 181:7-25.
[139] Progressive's Exh. 26; 29; 34.

in the face of the requirement of the contract for material handling and storage."[140] The Court agrees. COR's 22, 25, and 30 are disallowed.

*COR 26*.[141] Progressive requests $7,203.31, to "upgrade" expansion joints to reduce ruptures in the installed hot water lines. Progressive initially used the wrong product. When the lines ruptured, Progressive installed the correct expansion joints. Progressive should pay for not using the correct expansion joints the first time. The fact K&K did not initially reject the work is irrelevant. COR 26 is disallowed.

*COR 28.*[142]   Progressive requests $821.27 to put drains in large decorative planters. The drains were specified in the original plans. Progressive failed to install them. K&K correctly rejected this change order because the drains were not an alteration to Progressive's work, but "were shown on the plumbing drawing."[143] COR 28 is disallowed.

In conclusion, K&K rightfully rejected seven of the ten COR's—11, 21, 22, 25, 26, 28 and 30. The remaining three COR's 9, 12, and 18 are allowed in full for $30,042.15. Combined with the $38,208.65, allowed for the Partially Allowed COR's, Progressive is entitled to $68,250.80, from K&K, before consideration of the extra 54% labor burden Progressive requests in its COR's.

### *54% Labor Burden is Disallowed*

Progressive charged an additional 54% "labor burden" in most of the disputed COR's totaling $19,475.38. With the complete disallowance of COR's 11, 21, 26, 28, and 30, above, this extra charge now is reduced to $14,904.98.[144]   K&K contends Progressive may not add this extraordinary charge on its COR's. The Court agrees.

---

[140] 9/25/18 Tr. at 78:18-21.
[141] Progressive's Exh. 30.
[142] Progressive's Exh. 32.
[143] 9/25/18 Tr. at 86:11.
[144] The 54% Labor Burden requested on the disallowed COR's are (1) COR 11 ($1,027.34); (2) COR 21 ($2,203.00); (3) COR 26 ($789.26); (4) COR 28 ($220.32); and (5) COR 30 ($330.48), which, when totaled, equal $4,570.40. ($19,475.38-$4,570.40 = $14,904.98).

Progressive contends this extra charge reflects costs borne by a contractor on its full-time employees, including "taxes, social security, and vacation."[145] Mr. Reed credibly testified for K&K that—whether Progressive was billing for its own employees' time or for day laborers—the labor burden *already* was built into the hourly rate billed to K&K.[146] Therefore, "[t]hey weren't entitled to that under the terms of the [Sub]contract. They were entitled to a ten percent markup on their overall cost."[147]

Mr. Lawson, Progressive's President, admitted that adding a 54% labor burden on top of fees it paid to its labor supply companies, results in "pure profit" for Progressive.[148]  He also admitted that he traditionally does not add a 54% labor burden on workers hired from skilled labor companies because their burden is included in their fees.[149] The Subcontract limited profits to 10%, and Progressive did not explain the 54% charge in its memorandum of law.[150] The Court can find no justification to allow the 54% labor burden and will reduce K&K's payment obligation to pay the allowed COR's by $14,904.98.  Therefore, K&K owes Progressive $53,345.82 for allowed COR's, calculated: $68,250.80 - $14,904.98.

### *Calculation of Breach of Contract Damage**s***

After this analysis, the damage calculation is simple.  The parties agree that K&K owes Progressive $149,979.54 under the Subcontract, undisputed COR's, and deducting the ASTD charge.   K&K is entitled to damages against Progressive for breaching the Subcontract of $27,485.23; and K&K owes Progressive $53,345.82 for the allowed COR's. Doing the math, Progressive is awarded a net amount of $175,840.12 ($149,979.54 - $27,485.23 + $53,345.82 = $175,840.13.)

---

[145] 9/27/18 Tr. at 23:24.
[146] 9/25/18 Tr. at 72:8-22.
[147] 9/25/18 Tr. at 72:3-5.
[148] 9/27/18 Tr. at 50.
[149] *Id.*
[150] K&K's Exh. 3. Subcontract at Exhibit B "Scope of Work" ("The subcontractor's total allowed combined overhead and profit shall be ten percent (10%) applied to the sum total of the subcontractor's costs for approved changes to the work.")).

## **K&K Did Not Breach Tennessee's Prompt Pay Act**

Besides breach of contract damages, Progressive raises two additional claims against K&K. First, Progressive argues K&K breached Tennessee's Prompt Pay Act.[151] Under § 103 of the Prompt Pay Act, all construction contracts on a project in Tennessee may "provide for the withholding of retainage; provided, however, that the retainage amount may not exceed five percent (5%) of the amount of the contract."[152] The Act also provides that "[t]he prime contractor shall pay all retainages due any subcontractor within ten (10) days after receipt of the retainages from the owner."[153] Section 104 of the Act further states that retainage "shall be deposited in a separate, interest-bearing, escrow account with a third party which must be established upon the withholding of any retainage."[154]

On December 31, 2015, K&K received its final payment from the Owner. The amount of retainage owed to Progressive at the time was $80,060.51. Progressive argues K&K violated the Act because K&K did not pay Progressive within ten days nor did it place Progressive's retainage ($80,060.51) into an escrow account upon receipt of the final payment from the Owner.

K&K, however, legitimately could withhold payment or escrowing the funds because there was a valid dispute (now proven) on whether Progressive had breached the Subcontract. A critical element of the Act was that "[p]erformance by a subcontractor, materialman or furnisher *in accordance with such person's written contract* with a contractor for improvement of real property shall entitle such person to payment from the contractor."[155]  The Tennessee statute

---

[151] *See* TENN. CODE ANN. § 66-34-101 *et seq*.
[152] *See* TENN. CODE ANN. § 66-34-103(a)-(b).
[153] *Id.*
[154] TENN. CODE ANN. § 66-34-104(a).
[155] TENN. CODE ANN. § 66-34-301 (emphasis added).

particularly contemplates similar situations where a contractor withholds payment:

> Nothing in this chapter shall prevent the contractor from reasonably withholding payment or a portion of payment to the subcontractor, materialman or furnisher; provided, that such withheld payment **is in accordance with the written contract between the contractor and the subcontractor, materialman or furnisher**.[156]

By the time Progressive sought its balance due under the Subcontract, K&K and Progressive were disputing, among other issues, who breached the Contract and whether Progressive was liable for K&K's labor supplementation costs and payments to other contractors under the Subcontract. There was a legitimate dispute on what payment was due under the Subcontract, and these disputes led to a five-day trial. The Court can find no violation of the Prompt Pay Act or any fault by K&K in withholding payment or failing to escrow the $80,000. K&K was acting within its rights under the Subcontract.

### K&K Did Not Tortiously Interfere with Progressive's Subcontract

Progressive lastly claims K&K tortiously interfered with Progressive's subcontract with Mazzeo Plumbing. Progressive was suffering from labor shortage and hired a local plumbing company, Mazzeo Plumbing, for extra help.[157] Mazzeo Plumbing left the Project within weeks, perhaps over a disagreement between Mr. Mazzeo and K&K's lead superintendent, Damian Schnapf.[158]

Progressive argues K&K interfered with Progressive's contract with Mazzeo Plumbing by not allowing Mr. Mazzeo to return on the Project site. The facts, however, show that both K&K and Progressive were blessed or cursed by somewhat strong-willed supervisors or sub-subcontractors. Progressive itself admits that Mr. Mazzeo was a "colorful character," and the Court

---

[156] TENN. CODE ANN. § 66-34-303 (emphasis added).
[157] Progressive's Exh. 79 (Agreement between Progressive and Mazzeo).
[158] 9/27/18 Tr. at 66.

finds that any disagreements between Mr. Mazzeo and Mr. Schnapf were due to the equal fault of both parties.

K&K barred only Mr. Mazzeo personally from the site — not Mazzeo Plumbing or any of its other employees — for violating the "Job Site Violence" clause in the Subcontract.[159] Mr. Mazzeo later informed Progressive he was pulling his workers from the job.[160] Mazzeo Plumbing employees continued to work on the Project for several weeks after Mr. Mazzeo was removed from the site.[161] The evidence shows that Mazzeo Plumbing ultimately terminated its relationship with Progressive over a billing dispute, not because of Mr. Mazzeo's disagreement with Mr. Schnapf.[162] Progressive has failed to prove K&K tortiously interfered with the Subcontract or their agreement with Mazzeo Plumbing.

### K&K Proof of Claim is Disallowed in Full

K&K filed a Claim 35-1 in the main case asserting Progressive owes $813,547.94. Progressive filed an Objection to K&K's claim.[163] K&K and Allied filed responses.[164] The arguments raised in these pleadings were consolidated with this adversary proceeding and now are resolved in this Memorandum Opinion. K&K may have no recovery under its Claim; Rather, it owes Progressive $175,840.13. Progressive's Objection is sustained; K&K's Claim 35-1 is disallowed.

### Allied's Liability and Claims for its Attorneys' Fees and Costs

Allied issued its Bond to guarantee Progressive's performance of the Subcontract for $1,750,000.[165] Allied argues that, even if the Court found that K&K could recover damages against Progressive, Allied has no liability to K&K because K&K breached both the Subcontract and the

---

[159] 9/27/18 Tr. at 66; K&K's Exh. 3 at 41.
[160] K&K's Exh. 106.
[161] Mazzeo's Deposition at 102-03.
[162] K&K's Exh. 165 ("As far as my contract with you, Progressive Plumbing has nullified it due to the fact that [K&K] was never notified by PPI that I was a sub-contractor as per David Reed.")
[163] Doc. No. 448 in 6:15-07275-KSJ.
[164] Doc. Nos. 468 and 472 in 6:15-07275-KSJ.
[165] K&K's Exh. 4.

Bond by failing to give Allied timely notice of Progressive's default. As Progressive's surety, Allied is liable to K&K under the Bond only if the Court found that K&K was entitled to a net judgment. Given that Progressive now is due $176,000 from K&K,[166] Allied's claims are now moot with one exception—Allied seeks the payment of its attorneys' fees from K&K as a prevailing party.

Under Florida law, a prevailing party has no general entitlement to attorney's fees unless a specific statute or contractual provision provides otherwise.[167] Prevailing party contractual attorney's fee provisions are strictly construed, and "if an agreement for one party to pay another party's attorney's fee is to be enforced it must unambiguously state that intention and clearly identify the matter in which the attorney's fees are recoverable."[168] Florida Statute § 57.105(7) further renders a prevailing party contractual attorney's fee provision bilateral in effect.[169]

A surety, as a prevailing party, may recover its attorney's fees if the underlying bonded contract provides for the recovery of attorney's fees.[170] Although Florida state courts have awarded sureties prevailing party attorney's fees, they have done so when the surety's principal prevailed as well.[171] Because Allied principal's—Progressive—did not prevail, most cases awarding sureties attorney's fees provides this Court with little guidance resolving this issue.

---

[166] Allied may have a valid subrogation claim to all or a portion of this award under its subrogation count against K&K and its crossclaim against Progressive.

[167] *International Fid. Ins. Co. v. Americaribe-Moriarty JV*, 906 F.3d 1329, 1335 (11th Cir. 2018)(citing *Dade Cty. v. Pena*, 664 So2d 959,960 (Fla. 1995)).

[168] *International Fid.* at 1136 (quoting *Sholkoff v. Boca Raton Cmty. Hosp., Inc.*, 693 So.2d 1114,1118 (Fla. 4th DCA 1997)).

[169] *See* Fla. Stat. § 57.105(7) which provides "If a contract contains a provision allowing attorney's fees to a party when he or she is required to take any action to enforce the contract, the court may allow reasonable attorney's fees to the other party when that party prevails in any action, whether as plaintiff or defendant, with respect to the contract."

[170] *See Gibbs Const. Co. v. S.L. Page Corp.*, 755 So.2d 787, 791 (Fla. 2d DCA 2000); *Federal Ins. Co. v. Excel of Orlando, Inc.*, 685 So.2d 896, 898 (Fla. 5th DCA 1996); *But See International Fid.* 906 F.3d at 1339 (declining to address whether surety principles allowed a surety to recover attorney's fees based on the underlying bonded contract as the underlying bonded contract itself did not allow for the recovery of attorney's fees).

[171] See *Gibbs Const.* 755 So.2d 787 (affirming in part attorney's fees award to surety and principal); *Excel of Orlando,* 685 So.2d 896 (awarding surety "who stepped into Parrish's [principal] shoes" attorney fees as prevailing party)

A case that provides guidance is *Merchants Bonding Co. (Mut.) v. City of Melbourne*.[172] In *Merchants Bonding*, the City of Melbourne filed a two-count complaint for breach of contract against Continental Acreage Development Company, a general contractor, and Merchants Bonding Company, the surety who issued the underlying performance and payment bond. After a six-day trial, the state trial court found both Continental and the City at fault, entered a final judgment denying relief to all parties, including Merchants' request for attorney's fees.

Merchants appealed the denial of its attorney's fees. Florida's Fifth District Court of Appeals affirmed the trial court's decision to deny Merchants' attorney's fees, reasoning:

> We agree with the trial judge that Merchants would be entitled to an award of prevailing party attorney's fees as the surety, under the contract between Continental and the City, if Continental were the prevailing party. Merchants' sole claim to attorney's fees rises and falls under the contract between Continental and the City. Had it prevailed on a defense applicable to it in its capacity as a surety, such as no liability under the bond, then its surety status as to Continental would have vanished, along with any right to claim under its principal's contract with the City. However, Merchant did not prevail on its own defenses. It was not held liable for damages solely because Continental was not found liable.[173]

And, the trial court had the discretion to determine that no party prevailed, including Merchants.

Here, with the final decision finding no prevailing party and denying attorney's fees *vis-à-vis* K&K and Progressive, the issue arises whether *Allied* may recover its attorney's fees either from K&K under its Counterclaim or from Progressive under its Crossclaim.[174] A different analysis is required, and the Court welcomes further input from the parties on this issue and on all issues raised in the Crossclaims between Progressive and Allied.

Initially, the Court will direct the parties to return to mediation. This further mediation allows the parties to discuss the award of Allied's attorney's fees and the crossclaims between Progressive and Allied. The Court also encourages the parties to consider a global settlement with

---

[172] 832 So.2d 184 (Fla. 5th DCA 2002).
[173] *Merchants Bonding*, 832 So.2d at 186.
[174] Doc. Nos. 12, 20, 35.

the benefit of this Memorandum Opinion. A separate order will enter directing the parties to complete this mediation and file any settlement agreements by **December 13, 2019**. A further status conference to discuss future briefing or trial scheduling is set for **2:00 p.m. on January 7, 2020**. Pending the completion of this mediation process, the Court defers entry of any final orders to give the parties one last chance to resolve their differences consensually.

###

The Clerk is directed to serve a copy of this Order on all interested parties.